# FINDINGS OF FACT AND DECISION

Case Number:                    228745

Student's Name:                 █████████████

School District:                N.Y.C. Dept. of Ed., District # 24

Impartial Hearing Officer:      Richard J. Zeitler, Jr.

Date of Filing:                 07/07/2022

Hearing Requested by:           Parent

Dates of Hearing:               09/07/22

Record Close Date:              09/14/2022

Date of Decision:               09/20/2022

Findings of Fact and Decision                                                                                2
Case No. 228745

## Names and Titles of Persons Who Appeared September 7, 2022

### For the Student

John Henry Olthoff, Esq.
Tiffany Semm, Special Education Director, iBrain
Maytinee Bird, Parent

### For the New York City Department of Education

Erin Dunn, Esq.

## **Background**

On July 6, 2021, the Parent, by and through the Parent's attorneys, filed a due process complaint (DPC)[1] against the New York City Department of Education (DOE or Department), on behalf of the Student, under Case No. 228745, pursuant to the Individuals with Disabilities Education Act ("IDEA" or the "Act"),[2] and the New York State Education Law.[3]

The DPC asserts the following. The Student has been denied a free and appropriate public education (FAPE) for the extended (12-month) 2022-2023 school year after the Committee on Special Education (CSE) held an individualized education program (IEP) meeting for the Student on April 6, 2022,[4] and developed an IEP that recommended a District 75 (D75) school with a program that that was not appropriate to address "her extensive medical and academic needs."[5] The placement school and its 6:1:1 program offered in the IEP would not be appropriate because the Student would not be grouped with a composition of students who have similar needs and development, because it is only partially wheelchair accessible and the Student requires a wheelchair, because the school cannot provide the quiet, distraction-free environment she needs to make progress, and because the placement school does not have an extended school day, resulting in the Student receiving all related services in her IEP on a push-in basis, which would deprive her of the opportunity to learn and practice new skills free from distraction.

The Department further denied the Student a FAPE by failing to recommend essential services to the Student, including a 1:1 private nurse to attend to her medical needs, transportation services that address all her medical needs (including a travel nurse and adult supervision, wheelchair accessibility, a ventilator, a lift bus, and air conditioning), and music therapy, from which the Student has clearly benefitted.[6] The DOE also failed to conduct the mandated triannual evaluation, and she is in need of a neuropsychological evaluation, consistent with the Department's "own Standard Operation Procedures Manual recommendation of neuropsychological evaluations for students who have traumatic brain injury [TBI]."[7]

---

[1] *See* Ex. A.

[2] *See* 20 U.S.C. § 1415(f).

[3] *See* Educ. Law §§ 4404(1) and 3602-c(2)(b)(1).

[4] *See* Ex. A-3; *see also* Ex. 1 and Ex. C.

[5] Ex. A-3 to A-5.

[6] *See id.* at A-6.

[7] *Id.*

Give the denial of FAPE, the Parent has placed the Student in the Private School "for the 2022-2023 school year[,]" which "is appropriate to address her academic, physical, and social/emotional needs, and is reasonably calculated to confer educational benefits upon" the Student.[8]  The Parent seeks for the Department to fund the full cost of tuition for the 2022-2023 extended school year; the costs of related services; the cost of a 1:1 private duty nurse; the cost of a 1:1 paraprofessional; the cost of special education transportation with limited time travel, a 1:1 transportation nurse, air conditioning, a lift bus and a regular-sized wheelchair; an order for the Department to directly fund an independent neuropsychological evaluation; and an order that a new IEP meeting be convened to address any changes.[9]

## Procedural History

I was appointed the impartial hearing officer (IHO) over this matter on July 28, 2022.  On August 15, 2022, a pre-hearing conference was held before me, and I issued a Pre-Hearing Conference Summary and Order on August 30, 2022.[10]  The merits hearing was held before me on September 7, 2022, wherein all the exhibits were admitted into evidence.[11]  At the hearing, the Parent produced as her witnesses the Private School Special Education Director and the Parent herself.[12]  The Department conceded the issue of FAPE and produced no witnesses, instead relying upon its exhibits and arguments made during the hearing with respect to Prong 2 and Prong 3 of the *Burlington/Carter* test.[13]

## Findings of Fact

The following was not in dispute.  The Student is six years old and, for the 2022-2023 extended school year, has been parentally placed at the Private School.[14]  The Student is

---

[8] *Id.*

[9] The Parent describes this last request as "if necessary."  The DPC also raised the issue of pendency.  At the Pre-Hearing Conference (PHC), the parties informed me that pendency was in the process of being resolved by and between them.  In my PHC Summary and Order (*see* IHO Ex. I), I noted their efforts at resolving pendency, and I instructed the Parent to let me know by September 1, 2022 if she required a pendency hearing.  The Parent never raised pendency again and I now consider it a moot issue.

[10] *See* IHO Ex. I.

[11] *See* Exs. 1 through 17, and A through J.

[12] Unsigned, un-notarized affidavits were submitted for both witnesses; when they appeared, they both attested to the statements in those affidavits under oath, and were also available for cross-examination and additional questioning.

[13] See Legal Framework and Analysis sections below for a description of the test.

[14] *See* Ex. A.

classified by the CSE as having a TBI.[15]  The Student has an acquired brain injury, Cerebral

Palsy, seizure disorder, Heterotaxy Syndrome, and a heart defect that required a cardiac shunt.[16]

The Private School developed its own IEP on April 5, 2022,[17] which details the

following.  The Student has a substantial number of physical limitations, including the need for

paraprofessional assistance for the movements of daily living (including dressing, with a score of

52 of 96; a grooming score of 104 of 204; a feeding score of 58 of 120; a toileting score of 29 of

96; and fine motor scores of 82 of 132 for reaching, 101 of 204 for grasping objects, 36 of 84 for

releasing objects, and 60 of 120 for hand manipulation).[18]  Her functional independence measure

(FIM) (graded from 1 [complete dependence] to 7 [complete independence]) was 0/1 for

physically transferring, including kneeling-to-standing, 3 for standing and sitting-to-standing, 4

for rolling, supine to sitting, prone quadruped (all fours), quadruped to kneeling, and walking,

and 7 only for sitting to supine.[19]  The scores also show the Student's improvement from January

of 2021 to January of 2022, including an increase in lying and rolling from 29/51 to 42/51;

crawling and kneeling from 4/42 to 10/42; and standing from 6/39 to 8/39.[20]

The Student "requires a paraprofessional at all times to assist with transfers, navigation of

environment, participation and attention in daily activities, positional changes, donning/doffing

of orthotics . . . equipment set-up, access to [assistive technology] and communication devices,

safety, and redirection to activities during therapy sessions and throughout her school day."[21]

She becomes startled by noises or people within her environment, and requires a 6:1:1 class size

with decreased distractions and an isolated area to reduce stimuli, which aids her attention to

tasks.[22]

Her then-present levels of performance included that she was able to meet most of her

goals for the 2021-2022 school year, including identifying words with pictorial cues and

identifying sight words with 80% accuracy, answering "wh" questions (who, what, where, when,

---

[15] *See* Ex. 2-1.

[16] *See* Ex. A-2.

[17] *See* Ex. B.

[18] *See id*. at B-4 to B-8.

[19] *See id*. at B-15 to B-16.

[20] *See id*. at B-14; *see also* Tr. at pp. 56 to 58 (explaining how a higher score is a better result).

[21] *Id*. at B-11.

[22] *See id*. at B-10 to B-11.

and why) 80% of the time, matching numbers to quantity with minimal assistance, completing an "AB" pattern 80% of the time, and sorting objects by size and color with minimal physical assistance.[23]  The Student is non-verbal, and uses assistive technology (AT) (a dynamic display high-tech speech generating device [SGD]) to aid her in both receptive and expressive language.[24]  She has also learned some approximations of American Sign Language (ASL), and can make some vocalizations.[25]  She requires a feeding tube but can eat orally, with physical assistance.[26]

The Student has also received music therapy from a Board-Certified Music Therapist.[27] The Student is very shy and often does not make eye contact, and "[a]t times, she exhibits an increased sensitivity to sounds or startles more easily."[28]  Music therapy provides "live, interactive, and highly individualized music exercises to help students achieve goals faster and more efficiently."[29]  The student "appears to enjoy music and responds to various instruments, and timbres of sounds" and "[s]he has made improvements in her ability to sustain participation in a presented activity for more than 90 seconds, with minimal to moderate prompts."[30]  She will make eye contact with the music therapist, her paraprofessional, and her nurse.[31]

The "Management Needs" of the Private School IEP includes: a quiet environment, 1:1 instruction, a highly structured classroom or corner room with less stimulus, adaptive equipment, a familiar communication partner to interpret the Student's ASL signs and vocalizations, a SGD, a 1:1 paraprofessional, an activity chair, wedges for pelvic positioning, therapy balls, bolsters, swings for promoting functional mobility, bilateral functional hand orthoses for fine motor activities, and a 1:1 nurse to: monitor feeding and aspiration precaution and seizure activity and to monitor oxygen levels and heart rate and incontinence and bowel movements, and to determine the Student's coping skills that affect her social interactions, and to assist and educate

---

[23] *See id*. at B-17.

[24] *See id*. at B-17 to B-21.

[25] *See id*. at B-22 to B-26.

[26] *See id*. at B-30.

[27] *See id*. at B-37.

[28] *Id*.

[29] *Id*.

[30] *Id*.

[31] *See id*.

the family for implementation of interventions when the Student is at home.[32]  The recommended services included AT through alternative forms of communication, speech therapy, physical therapy, occupational therapy, music therapy, parent counseling and training, and the recommended program consisted of a 6:1:1 classroom over a 12-month school year with a  1:1 paraprofessional and a 1:1 nurse.[33]

The day after the Private School IEP was developed, the DOE developed its IEP, which generally recognized the same deficits and needs of the Student.  The DOE IEP recommended a 6:1:1 program in a D75 school, with AT, a 1:1 paraprofessional, speech-language therapy, occupational therapy, physical therapy, and parent counseling and training.[34]  The DOE IEP recommends its program for a 12-month school year as well.[35]  The Department sent the Parent a combined prior written notice (PWN) and school location letter (SLL) describing this recommendation and offering the Public School as the designated placement on May 20, 2022.[36]

<u>The Department's Case</u>

The Department Attorney made a short opening statement wherein she acknowledged that the DOE "will not demonstrate that it provided the student with a free appropriate public education, or FAPE, for the '22-'23 school year."[37]  The Department chose not to put forth any witnesses, and reserved its arguments for the closing statement, and also reserved any discussion of its exhibits for its cross-examination of the Parent's witnesses and for closing.[38]

<u>The Parent's Case</u>

*Private School Director of Special Education*

As her first witness, the Parent produced the Director of Special Education at the Private School, who oversees the educational components of the school's program.[39]  She described the Private Schools as a "private, not-for-profit, and highly specialized special education program in

---

[32] *See id*. at B-38 to B-45.

[33] *See id*. at B-46 to B-64.

[34] *See* Ex. C-65 to C-66.

[35] *See* Ex. C-67.

[36] *See* Ex. D.

[37] Tr. at pg. 15.

[38] *See* Tr. at pp. 15 to 16.

[39] *See* Ex. I ¶ 1.

New York City created for children who suffer from acquired brain inures or brain-based disabilities" with "a 12-month extended school-year calendar" that "offers all services during its extended school day, which runs from 8:30 a.m. to 5:00 p.m."[40]  Most of its students have the TBI disability classification; all students have a 1:1 paraprofessional, and many also require a 1:1 nurse, as the students "are either intensive or highly intensive . . . which require[s] a significant degree of individualized attention and intervention."[41]

The Director knows the Student to be a "6-year old girl with an acquired brain injury" who is "non-verbal and non-ambulatory" and thus "has highly intensive management needs" and needs "adult support for all activities of daily living due to her brain-based condition."[42]  The Student's program for the 2022-2023 school year will include a 6:1:1 class, occupational therapy, physical therapy, speech and language therapy, music therapy, and AT services for her AT device.[43]  In addition to these services, the Student has a 1:1 nurse and a 1:1 paraprofessional.  The nurse is there "to attend to her medical needs, including monitoring seizures, preventing aspiration, and administering medication," while the paraprofessional "help[s] her to participate in her educational program."[44]  The nurse has been critical to the Student's needs, as she has "a heart condition" and "can suffer from little periods of sudden drops in her heart rate, which . . . decreases her overall oxygen levels and impacts what activity she can safely participate in."[45]  There are, in fact, times when the Student required supplemental oxygen, so the nurse will "check her oxygen levels before she participates in more active or gross motor-based activities or if she seems to be . . . struggling in some way."[46]

All of the students in the Student's 6:1:1 class "have similar functioning levels" and "are dependent on assistive technology and require 1:1 paraprofessionals."[47]  The Student receives

---

[40] *Id.* ¶ 5.

[41] *See id.* ¶¶ 6 to 7.

[42] *Id.* ¶ 11.

[43] *See id.* ¶ 13.

[44] *Id.* ¶ 14.

[45] Tr. at pg. 22.

[46] *Id.*

[47] *Id.* ¶ 16.

special transportation that includes the use of a lift bus with oxygen and air conditioning, wheelchair accessibility, limited transportation time, and a 1:1 transportation nurse.[48]

The Director attended the Student's April 6, 2022 DOE IEP meeting.[49] She disagreed with the Department's decision to not recommend a 1:1 nurse or music therapy, and the recommendation of a D75 school, adding, "I believe [the Student's] medical and educational needs are too intensive for her to be able to be educated in a District 75 school."[50] With respect to the Student's time at the Private School, however, it has been the Director's "professional opinion [that the Student] has made significant progress in all areas" and the Director "anticipate[s] her to continue to build upon [her] progress while in our program."[51]

On cross-examination and under additional questioning, the Director testified as follows. A portion of the Student's school day is devoted to 1:1 instruction with the teachers to work "specifically on her targeted IEP goals" as "she is a very, very bright little girl."[52] About half of the Student's related services are pushed-in, except for toilet training, gate walking and other skills that must be pull-out services.[53] The Student's teacher is a certified special education teacher, and all of her related service providers are licensed in their fields.[54]

Because of how easily the Student becomes startled, it is harder for her to focus when things get noisy.[55] An example of how academic instruction continues during her related services is when her occupational therapists work with her to reach across midline to identify letters that she heard during a lesson, and to use her AT to show that she is building upon her comprehension skills, including when answering "wh" questions.[56] The paraprofessional is there to help the Student with movement and positioning, to manage the environment so that the Student can focus on the therapist's activity.[57] The nurse is there to monitor the Student's

---

[48] *See id*. ¶ 15.
[49] *See id*. ¶ 18.
[50] *Id*.
[51] *Id*. ¶ 17.
[52] Tr. at pg. 32.
[53] *See id*. at pp. 25 to 26.
[54] *See id*. at pp. 27 to 29, and at pg. 31.
[55] *See id*. at pg. 33.
[56] *See id*. at pp. 33 to 34.
[57] *See id*. at pp. 34 to 35.

oxygen levels and for positioning when the Student is transitioned from her wheelchair to a bench, a mat, a therapy ball, or to their stander.[58]  The nurse monitors these activities because "it's not often easy . . . to see that . . . her lips are starting to turn blue . . . which has happened . . . [and] the nurse starts to see it and says . . . we have to cut off . . . we can't continue with this activity or . . . worst case scenario . . . provide the supplemental oxygen, if needed."[59]  The nurses do not take on the role of the paraprofessional because it "falls outside of . . . the scope of their assigned duties" and "many aren't comfortable with it because they feel they are compromising the things that they are actually tasked to do" and the nurse "needs to be monitoring what [the Student] is looking like" and cannot be "preparing materials or going and fetching something for a therapist[.]"[60]

With respect to music therapy, it helps the Student communicate, as she will choose what songs she would like to listen to during social activities,[61] and it is also incorporated into her therapy.  The Director explained that "there are music therapy techniques that . . . help to elicit and encourage students to produce sounds and vocalizations . . . [and] help students to do sit and stand transfers" with "specific music cues[.]"[62]  There is also a specific "technique . . . to [give the Student] to time gait" that "increases . . . motor planning" where "live music support" is used to "time it out to their footsteps and then gradually increase the . . . rate" and "the student . . . subconsciously responds to the . . . musical cues and then[] finds themselves . . . walking further or walking faster."[63]

The Student is provided with 60 minute sessions for her related services because of the amount of deficits she is addressing, and because she needs to take breaks to process what she has learned; the Student does not have the same level of meta-cognition as other students, so she needs clinical support and time to practice each activity a number of times before she can do them on her own and make improvements.[64]  The Private School wants the Student "to be able to

---

[58] *See id*. at pp. 35 to 36.

[59] *Id*. at pg. 36.

[60] *Id*. at pg. 37.

[61] *Id*. at pp. 39 to 40; *see also* pg. 43.

[62] *Id*. at pp. 41 to 42.

[63] *Id*.

[64] *See id*. at pp. 47 to 48.

functionally use those skills in a way that's helping her to maintain educational access."[65]  The
Director noted the progress the Student has made since she started at the Private School in 2021,
giving the example that the Student "did know some of the letters and some of the letter sounds
but she really was focused on initial sounds.  So now, she's able to identify the final sounds, as
well as which vowel goes in the medial point."[66]

 *Parent*

  The Parent was the second and final witness.  She testified as follows.  The Student has
attended the Private School since the 2020-2021 school year.[67]  She attended the April 6, 2022
DOE IEP and recalls that the IEP team "agreed with [the Private School's] recommendations for
related services and class size" and while she "was concerned about the recommendation for a
District 75 public school . . . [she] agreed to visit the school DOE recommended."[68]  She also,
however, "disagreed with the failure to recommend music therapy" as well as the decision to
"not recommend a 1:1 nurse for [the Student], because she cannot attend school without a
nurse."[69]

  The Parent has found the Student to have "made progress in many areas" since attending
the Private School.[70]  She has "become stronger and has improved her communication."[71]  She
also pays attention longer.[72]  The Parent is "satisfied with [the Student's] current educational
placement" at the Private School and "believe[s] that [the Student] should remain at her current
placement in order for her to continue to make progress."[73]  She also testified that the family
does not earn enough income to cover the cost of the Private School.[74]

  On cross-examination and under additional questioning, the Parent testified as follows.
She contracted with a transportation company to provide her with an ambulance that can take the

---

[65] *Id*. at pg. 48
[66] *Id*. at pp. 55.
[67] *See* Ex. J ¶ 4.
[68] *Id*. ¶ 5.
[69] *Id*.
[70] *See id*. ¶ 4.
[71] *Id*.
[72] *See id*.
[73] *Id*. ¶ 7.
[74] *Id*. ¶ 8.

Student to and from the Private School, for $345.00 per trip.[75]  A doctor recommended that the Student travel in the ambulance with a nurse and not a paraprofessional, and that nurse is the same nurse who attends school with the Student, and also the same nurse who works with the Student at home.[76]

<u>Closing Arguments</u>

*DOE's Closing*

In its closing, the Department's Attorney argued the following.[77]  The Parent's evidence did not establish that the unilateral placement was appropriate for the Student.  The Director of Special Education was not a direct teacher for the Student and often her testimony was generalized for the Private School's students and not directed specifically to the Student.  It was not clear how the program addressed the Student's particular needs.

The transportation contract charged a flat rate and made no adjustments for times when the Student did not attend school.  As for the school's tuition, it lists related services as a separate cost, and the Department should not be required to pay for it where it was described as services for every student.  Furthermore, the fact that music can be incorporated into some services does not mean that music therapy can be utilized and then charged as a separate cost.

Finally, the Parent requested a neuropsychological independent educational evaluation (IEE) at public expense in the DPC, but the Parent has not established that she disagreed with the Department's evaluations, which is a prerequisite for an IEE claim.  Moreover, the Parent asserts that the Department failed to conduct triennial evaluations but the Department's exhibits prove that DOE conducted sufficient evaluations.[78]

*Parent's Closing*

In closing, the Parent's Attorney contended the following.[79]  The Department conceded Prong 1 and is mounting a Prong 2 attack rather than fulfilling its obligations with respect to a FAPE.  The Private School is appropriate for the Student under the Second Circuit standard of

---

[75] *See* Tr. at pg. 69.

[76] *See id*. at pp. 70 to 74.

[77] *See* Tr. at pp. 78 to 82.

[78] The attorney cited to Exhibits 6 through 17 in support of this position.

[79] *See* Tr. at pp. 82 to 90.

being likely to produce progress, not regression, and that the chosen program is specialized and will create a benefit.  The standard does not require a unilateral placement school to provide certified teachers, licensed therapists, or IEPs, and the Private School offers all three.  The Private School IEP clearly demonstrates and, in fact, exceeds the standard.  The DOE even incorporated much of the Private School's IEP into its own IEP.

As for the equities, the tuition contract defers payment while the matter is being litigated, and both the tuition and transportation contracts the Parent signed ultimately make her responsible for payment.  The Parent has always cooperated with the DOE, has always attended IEP meetings, and has always followed every obligation in order for there to be appropriate programs for the Student.  Finally, the argument that the transportation company should not be paid when the Student does not attend school should be rejected, as the Departments pays its own providers a contracted rate regardless of whether students are going to school.

Credibility

Upon considering the evidence, including all admitted documents and the testimonies of the witnesses, I determine the following.  In admitting the documents, I found them all relevant, representative of the facts for which they were offered, detailed, and consistent.  I therefore credit all the documents, and the relative weight I afford documents or individual statements therefrom will be reflected in the analysis.  As for witness credibility, I found no reason to doubt the veracity of any witness and I credit their testimony as well.[80]

## **LEGAL FRAMEWORK**

The IDEA and the New York Education Law require school districts to offer a FAPE to each child with a disability residing in their district who requires special education programs or services.[81]  A FAPE consists of specialized education and related services designed to meet a

---

[80] In finding the Director of Special Education credible, I note that some of her testimony was with respect to the Student's medical needs, and there is nothing in the record to suggest that the Director has specialized medical expertise.  That said, the hearsay is an acceptable form of evidence in this tribunal, and the Director credibly testified that the nurses with whom she works closely and daily explained to her why it was so important that the Student's oxygen levels be regularly monitored, especially when she is more physically active.  *See* Tr. at pp. 60 to 62.  To this extent, I am accepting the Director's testimony as it relates to the Student's medical issues as factually established.

[81] *See* 20 U.S.C. § 1412 (a)(1)(A); Education Law §§ 4402(2)(a), (b)(2).

student's unique needs, provided in conformity with a comprehensive written IEP.[82]  When the education district complies with the procedural requirements set forth in the IDEA, and when the IEP developed through those procedures is reasonably calculated to enable the student to receive educational benefits, a FAPE has been established.[83]

The U.S. Supreme Court has determined that a board of education may be required to pay for educational services obtained for a child by the child's parent, if (1) there is no FAPE, in that the services offered by the board of education were inadequate or inappropriate, (2) the services selected by the parent were appropriate, and (3) equitable considerations support the parent's claim.[84]  These three prongs have become known as the *Burlington/Carter* standard in a tuition reimbursement case.[85]  In line with the standard, school districts have the burden of proof, including the burden of persuasion and burden of production as to Prong 1, while the parent or person in parental relationship seeking tuition reimbursement for a unilateral parental placement has the burden of proof as to the appropriateness of such placement in Prong 2.[86]  The standard required is a preponderance of the evidence.[87]

As part of its Prong 1 case, the DOE is not required to show that it attempted to "maximize" the potential of students with disabilities.[88]  Moreover, the law does not require the CSE to adopt the parent's preferred placement.[89]  Even so, an IEP must include a statement of the student's present levels of academic achievement and functional performance, establish annual goals designed to meet the student's needs resulting from the student's disability and enable the student to make progress in the general education curriculum, and must provide appropriate special education and services.[90]  Appropriateness means that the IEP accurately

---

[82] *See* 34 C.F.R. § 300.13.

[83] *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982).

[84] *School Committee of the Town of Burlington v. Department of Education, Massachusetts*, 471 U.S. 359 (1985); and *Florence County School District Four et al. v. Carter by Carte*r, 510 U.S. 7 (1993).

[85] *See id.*

[86] *See* NYS Educ. Law § 4404(1)(c).

[87] *See* 20 U.S.C. §1415(i)(2)(C)(iii); *see also Walczak v. Florida Union Free Sch. Dist.*, 142 F.3rd 119 (2nd Cir. 1998).

[88] *Rowley,* 458 U.S. at 189, 199; *Grim,* 346 F.3d at 379; *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 130 (2d Cir. 1998), at 132 (an "appropriate" education is "not one that provides everything that might be thought desirable by loving parents").

[89] *See S.Y. and R.Y. v. New York City Bd. of Educ.*, 15 Civ. 6277 (AT), 2016 WL 5806859, at 9 (SDNY Sept. 28, 2016).

[90] *See generally,* 34 CFR § 300.320(a) and 8 NYCRR § 200.4(d)(2).

reflects the results of evaluations to identify the Student's needs,[91] and then provides for the utilization of sufficient special education services,[92] and then is properly implemented.[93]  In order to demonstrate a FAPE, the  Department must offer "an IEP that is 'likely to produce progress, not regression,' and ... affords the student with an opportunity greater than mere 'trivial advancement.'"[94]  The IEP must be "reasonably calculated to provide some 'meaningful' benefit."[95]

If the Department proves that the recommended program in the IEP offers a free and appropriate education, the analysis is over, and the Student is not entitled to what is requested in the DPC.  If, however, it is determined that the Department did not establish a FAPE, the burden shifts to the Parent to prove Prong 2.  To accomplish this, the Parent must establish that the program they have selected is appropriate to meet their child's needs.[96]  While the unilateral placement must provide "educational instruction specifically designed to meet the unique needs of the student,"[97] it "need not meet the IDEA definition of a free and appropriate public education" or even "state education standards or requirements."[98]  Parents are not barred, for example, from an award of tuition reimbursement if the selected program does not employ certified special education teachers or develop its own IEP for the student.[99]  In fact,

> no one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining

---

[91] *See* 34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; *Tarlowe v. Dep't of Educ.*, 2008 WL 2736027, at 6 (S.D.N.Y. July 3, 2008), establishes annual goals related to those needs (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii].

[92] *See* 34 C.F.R. § 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; *see Application of the Dep't of Educ.*, Appeal No. 07-018; *Application of a Child with a Disability*, Appeal No. 06-059; *Application of the Dep't of Educ.*, Appeal No. 06-029; *Application of a Child with a Disability*, Appeal No. 04-046; *Application of a Child with a Disability*, Appeal No. 02-014; *Application of a Child with a Disability*, Appeal No. 01-095; *Application of a Child Suspected of Having a Disability*, Appeal No. 93-9.

[93] *See* 8 NYCRR 200.4(e)(7); *Application of a Child with a Disability*, Appeal No. 08-087.

[94] *Cerra*, 427 F.3d at 195, *quoting Walczak*, 142 F.3d at 130.

[95] *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 [2d Cir. 1997]; *see Rowley*, 458 U.S. at 192.

[96] *See A.D. ex rel. E.D. v. Bd. of Educ. of City Sch. Dist. of New York*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010) (citing *Frank G.*, 459 F.3d 356 at 364).

[97] *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d . Cir. 2007).

[98] *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d. Cr. 2006).

[99] *See id*. at 364 (citing *Carter*, 510 U.S. 7 at 14).

whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction."[100]

With respect to Prong 3, when deciding whether equities support the claim, including whether the remedy should be barred altogether or modified in some way, IHOs must consider a multitude of relevant facts. These can include whether the cost of the private education was unreasonable,[101] whether the parents failed to make their child available for evaluation by the district,[102] or whether actions taken by the parents were unreasonable.[103] The Second Circuit Court of Appeals has also looked at whether the parents should have availed themselves of needs-based scholarships or other financial aid from the private school, whether there was any fraud or collusion by the parent of the private school in generating the tuition, or whether the arrangement with the school was fraudulent or collusive.[104] "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA."[105] Equities have favored parents when they cooperate in good faith at all times with the DOE, including participating in the CSE meeting, visiting proposed placements, and notifying the district of unilateral placement.[106]

Specifically, as to notifying the DOE, reimbursement may be reduced or denied if the parents do not provide notice of the unilateral placement either at the most recent CSE meeting prior to their removal of the student from public school or by written notice ten business days before such removal. The notice must state that the parent is rejecting the proposed placement and must include their concerns, as well as their intent to enroll the student in a private school at public expense.[107] It is an important step, because the notice "gives school districts an

---

[100] *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459 F.3d at 364-65).

[101] *See L.K. v. New York City Dep't of Educ.*, 674 Fed. App'x 100, 101 (2d Cir. Jan. 19, 2017).

[102] *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

[103] *See id.*

[104] *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014).

[105] *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014).

[106] *See Mr. and Mrs. A v. New York City Dep't of Educ.*, 769 F. Supp.2d 403, 419 (S.D.N.Y. 2011).

[107] *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I).

opportunity to discuss with parents their objections to the IEP and to offer changes to the IEP designed to address those objections – all before the parents enroll their child in a private school and file a due process complaint."[108]  In a case where "parents unreasonably reject the school district's proposed changes to the IEP, or are otherwise uncooperative, courts and hearing officers are fully empowered to deny them reimbursement,"[109] as the parents of students enrolled in private school are not exempted from ten-day notice requirements.[110]

It is against this backdrop that I analyze the admitted evidence, including the Parent's unilateral placement and equitable factors.  If the factors weigh in favor of the Parents, an award is warranted, including any related services requested.  In considering an award, I am mindful that I have at my disposal "various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies,"[111] with the only limitations being that the remedy "be appropriate in light of the purpose of the Act,"[112] and that damage awards are not available under the IDEA.[113]

## **ANALYSIS**

Unilateral Placement

*Prong 1 – FAPE*

At the hearing, the Department chose to not demonstrate whether there was a free and appropriate public education, notwithstanding that the burden to do so rests with DOE.[114]  The Department therefore effectively conceded the question, and I find that it failed to prove, by a preponderance of the evidence, that the Student was provided a FAPE for the 2022-2023 school year.

*Prong 2 – Appropriateness of Unilateral Placement*

Having determined that the Department did not offer the Student a free and appropriate education, I must next turn to the Parent, who "bear[s] the burden of demonstrating that their

---

[108] *Bd. of Educ. of Yorktown Cent. Sch. Dist. v C.S.*, 990 F.3d 152, 171 (2d Cir. 2021).

[109] *Id*.

[110] *See S.W. v New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 361-363 (S.D.N.Y. 2009).

[111] *See Doe v. East Lyme*, 790 F.3d at 454.

[112] *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015) (citation omitted).

[113] *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir.2002).

[114] *See* NYS Educ. Law § 4404(1)(c).

private placement was appropriate, even if the IEP was inappropriate."[115]  A "private placement is only appropriate if it provides 'education instruction specifically designed to meet the unique needs of a [disabled] child.'"[116]

The Parent did not agree with the recommendation of the CSE and instead enrolled the Student in the Private School.  She offered into evidence the testimony of the school's Director of Special Education, its own comprehensive IEP that was provided to and utilized by the CSE, and its enrollment contract.[117]  The Parent's evidence explains how and why the specialized program developed for the Student provided her with multiple 60-minute related services pushed in and pulled out during an extended school day of 8:30 a.m. to 5:00 p.m. and over the course of a 12-month school year.[118]  The Private School was aware of her disabilities and her specific deficits, and for the 2022-2023 school year it addressed those needs through its own IEP that provided the Student with a 6:1:1 class, occupational therapy, physical therapy, speech and language therapy, music therapy, AT services for her AT device, a 1:1 paraprofessional, and a 1:1 nurse.[119]  Moreover, a parental placement need not have certified special education teachers, licensed related service providers, or develop its own IEPs, and the Private School offers all of this.

At the hearing, the Department argued that the Private School did not take an individualized approach to the Student's program.  The above evidence, however demonstrates that notwithstanding that all of the Private School's students have brain injuries and require similar related services, the application of services and the provision of education described in the extremely comprehensive, 64-page IEP was highly individualized for the Student.  As an example, the Director explained in detail how music therapy overlapped with occupational therapy and speech-language therapy to help her identify letters and pace her movements when standing and walking with support.[120]  Moreover, not every student required a nurse for the classroom or for transportation, but the Director more than sufficiently explained why a nurse

---

[115] *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d . Cir. 2007); *see also M.S. v. Bd. of Educ.*, 231 F.3d 96, 104 (2d Cir. 2000).

[116] *Gagliardo*, *supra.*, 489 F.3d at 115 (*citing* Frank G., 459 F.3d at 365 (*quoting* Rowley, 458 U.S. at 188-89)).

[117] *See* Exs. B, E, and I; *see also* Tr. at pp. 19 to 63.

[118] Ex. I ¶ 5.

[119] *See id*. ¶¶ 13 and 14.

[120] *See* Tr. at pp. 39 to 43.

was critical for both, given that the Student's heart condition can cause her oxygen levels to drop.[121]  The Director also credibly explained how all of the services and support help the Student "to be able to functionally use [her] skills in a way that's helping her to maintain educational access."[122]  The Parent, therefore, established that the Private School's program provided "educational instruction specifically designed to meet the unique needs of the student[.]"[123]

The Parent also showed that the program resulted in educational progress.  The Student attended the same school for the 2021-2022 school year, and the Private School IEP described how the Student achieved many of her goals over the course of that year, including identifying words with pictorial cues and identifying sight words with 80% accuracy, answering "wh" questions (who, what, where, when, and why) 80% of the time, matching numbers to quantity with minimal assistance, completing an "AB" pattern 80% of the time, and sorting objects by size and color with minimal physical assistance.[124]  She has also learned some approximations of American Sign Language (ASL), and can make some vocalizations.[125]  In addition, her intensive physical and occupational therapy has produced positive physical results.  From January of 2021 to January of 2022, the Student's scores in mobility increased as follows: lying and rolling from 29 out of a maximum score of 51 (29/51) to 42/51; crawling and kneeling from 4/42 to 10/42; and standing from 6/39 to 8/39.[126]  The Parent has verified these improvements as well, testifying that the Student has "become stronger and has improved her communication[,]"[127] and that she also pays attention longer.[128]  It is clear from this record that the Student has progressed physically and academically under the Private School's program.

"[E]vidence of . . . progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA."[129]  It is, however,

---

[121] *Id*. at pg. 36.

[122] *Id*. at pg. 48

[123] *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d . Cir. 2007).

[124] *See* Ex. B-17.

[125] *See id*. at B-22 to B-26.

[126] *See id*. at B-14.

[127] Ex. J ¶ 4.

[128] *See id*.

[129] *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir. 2003).

relevant to the inquiry as to whether "the placement provides educational instruction specially designed to meet the unique needs of a [disabled] child, supported by such services as are necessary to permit the child to benefit from instruction."[130]  Given the degree to which the Student's diagnoses have caused her to struggle when learning and to be able to learn, and the way in which the program addresses the Student's deficits and needs and the way it has demonstrably provided her more access to an education, the Private School clearly meets this standard.  On this record, therefore, I conclude that the program chosen by the Parent is appropriate to meet their child's needs,[131] and that Prong 2 of the *Burlington/Carter* analysis is satisfied.

*Prong 3 – Equitable Considerations*

Finally, I must weigh pertinent equitable factors.  I find on this record that the Parent never obstructed and that she, in fact, fully cooperated with the DOE during the entirety of the IEP process, which is "[i]mportant to the equitable consideration[s]" analysis[132] because equities can generally favor the parents when they cooperate in good faith and properly notify the district of the unilateral placement.[133]

The Parent attended the April 6, 2022 IEP meeting, and expressed her concerns to the team.[134]  She was sent a PWN and SLL on May 20, 2022,[135] and she informed the Department that she was willing to visit the recommended Public School.[136]  She rejected the Department's placement recommendation and sent a timely Ten Day Notice (TDN) on June 17, 2022, which informed the Department of her intent to place the Student in the Private School at public expense for the 12-month 2022-2023 school year,[137] beginning on July 6, 2022.[138]

---

[130] *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459 F.3d at 364-65).

[131] *See A.D. ex rel. E.D. v. Bd. of Educ. of City Sch. Dist. of New York*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010) (citing *Frank G.*, 459 F.3d 356 at 364).

[132] *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014).

[133] *See Mr. and Mrs. A v. New York City Dep't of Educ.*, 769 F. Supp.2d 403, 419 (S.D.N.Y. 2011).

[134] *See* Ex. J ¶ 5; *see also* Ex. C-23, C-24, C26, C-27, C-43, and C-73.

[135] *See* Ex. D.

[136] *See* Ex. J ¶ 5.  It is not clear what happened after this but the Department did not claim or present evidence that the Parent refused to go or otherwise inhibited the process of reviewing public placement options.

[137] *See* Ex. G.

[138] *See* Ex. E-1.

The Parent entered into the enrollment contract on June 14, 2022, which was after she received the SLL and disagreed with the recommended program.  To the extent that she signed the contract a few days before she served the TDN upon the DOE,[139] the contract allowed the Parent to "be released . . . without financial penalty or continuing responsibility for tuition payments . . . should the local school district offer a free appropriate public education to [the] Student by the first day of the School year[.]"[140]  This gave the Department until July 5, 2022 to offer a program the Parent could have accepted without her incurring any cost, and I therefore do not find that the evidence demonstrates the Parent signed the contract without intending to consider an appropriate pubic option.

There is also no evidence that the Parent failed to make the Student available for a DOE evaluation,[141] or that there was any fraud or collusion by the parent and/or the private school,[142] or that the Parent otherwise acted unreasonably.[143]  Finally, I do not find the Private School's tuition to be unreasonable.[144]  The contract lists tuition at $278,252.80,[145] which the Parent credibly established she cannot afford to pay,[146] although she was obligated to pay a $100.00 deposit.[147]  It is within my equitable authority to provide for direct funding when parents, "due to a lack of financial resources . . . have not made tuition payments but are legally obligated to do so."[148]  The Department did not challenge the amount that the Private School charges, except to argue against related services generally, and the music therapist particularly.  I have, however already determined that the Student's related services, including music therapy, were integral as part of the comprehensive program the Private School offered the Student, and part of what constituted an appropriate program for the Student.

---

[139] *See id*. at E-6.

[140] *See id*. at E-3.

[141] *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

[142] *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014).

[143] *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

[144] *See L.K. v. New York City Dep't of Educ.*, 674 Fed. App'x 100, 101 (2d Cir. Jan. 19, 2017).

[145] *See* Ex. E-1 to E-2 (breaking down the cost as $175,000.00 for base tuition, plus charges for eight types of related services at rates of $112.00 per hour when provided individually and $56.00 per hour when provided in a group, which, for the entirety of the 12-month 2022-2023 school year, calculates to $103.252.80).

[146] *See* Ex. J ¶ 8.

[147] *See* Ex. E-1.

[148] *Mr. and Mrs. A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 406 (S.D.N.Y. 2011).

Taken in their totality, the equitable considerations favor the Parent and do not favor the Department. I find that the third prong of the *Burlington*/*Carter* standard has been established for the Parent, and that remedies are therefore warranted in this case.

Remedies

*Tuition and Related Services*

The Parent offered into evidence proof that the cost of tuition for the 2022-2023 school year was $278,252.80, of which the parents had not paid any amount. On the above findings, I conclude that the Parent is entitled to full funding in that amount, to be paid directly to the Private School. This includes the cost of all related services, including those that might not be part of the contract, such as the 1:1 paraprofessional and the 1:1 nurse. To the extent such services are not covered by the enrollment contract, the Department shall be responsible for those costs as well, paid at the higher of either current market rate or the highest rate the Department has paid during the six months preceding this decision.

*Transportation*

The IDEA requires that a school district must provide transportation for a child with a disability "if that service is necessary for a disabled child 'to benefit from special education,' . . . even if that child has no ambulatory impairment that directly causes a 'unique need' for some form of specialized transport."[149] Transportation may be deemed necessary "if in its absence a disabled child in private school would be denied 'a genuine opportunity for equitable participation in [a special education program]', . . . or special education program benefits "comparable in quality, scope, and opportunity for participation . . . [to those provided for] students enrolled in public schools.'"[150] In addition, State law defines special education as "specially designed instruction . . . and transportation, provided at no cost to the parents to meet the unique needs of a child with a disability," and requires school districts to provide disabled students with "suitable transportation to and from special classes or programs."[151]

---

[149] *Donald B. by Christine B. v. Board of Sch. Commissioners of Mobile County, Ala.*, 117 F.3d 1371, 1374 (11th Cir. 1997) (internal citation omitted).

[150] *Id*. at 1375 (internal citations omitted).

[151] Education Law §§ 4401(1), 4402(4)(a); *see also* Education Law § 4401(2), and 8 NYCRR § 200.1(ww).

Here, the Parent established that the Student requires door-to-door transportation via ambulance, and that it is critical for there to be a 1:1 nurse present during transportation. The ambulance must also offer a lift that can hold the Student's wheelchair, have oxygen ready or a ventilator (or both), air conditioning, and provide service with as reasonably limited time travel as possible. The Department offered no evidence to challenge these services and, consistent with its obligations, the Department shall be responsible for their costs.

The Parent placed into evidence a transportation contract,[152] which provides the type of vehicle and accommodations described above, for a trip to school in the morning, and a trip home in the afternoon, for all school days between July 1, 2022, and June 30, 2023, during the 12- month 2022-2023 school year.[153] The contract charges $345.00 for each trip regardless of whether services are utilized, unless the transportation provider is at fault for a missed trip.[154] The contract also suspends payment through the completion of the administrative process for the Parent to seek public funding, but it does ultimately place responsibility for payment with the Parent.[155]

The Department's Attorney argued that if the DOE is ordered to pay for transportation, it should only be liable for school days where the Student actually went to school. The attorney offered no authority, however, for the proposition that transportation contracts should be treated differently than tuition contracts, such that services are treated *per diem*. I agree with the Parent's Attorney that if transportation services are provided and paid for by the Department for public school children regardless of whether the children attend school on a particular day, that the private bus transportation agreements should be treated the same. I find it reasonable that the transportation provider here will not charge for a trip that could not be completed due to the fault of the provider, but that it should be paid when a trip cannot be completed through no fault of the provider. Indeed, if the provider believes that a trip will commence, it will undoubtedly have expended time and resources to prepare for and attempt the trip, services for which it should be compensated. On this record, therefore, I find that the transportation provider should be paid in accordance with the terms of its contract. To the extent the travel nurse is not part of the services

---

[152] *See* Ex. F.
[153] *See id*. at F-1.
[154] *See id*. at F-2.
[155] *See id*. at F-2 to F-3.

provided under the transportation contract, such nurse shall be paid in the same manner as the 1:1 nurse in the Tuition and Related Services remedies section above.

*Independent Educational Evaluation*

An IEE is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question."[156]  In New York, the IEE can be ordered at public expense, but only "[i]f the parent disagrees with an evaluation obtained by the school district[.]"[157]  Here, the Parent asserts that the Department "failed to conduct the mandated 3-year ('triennial') evaluation" for the Student,[158] but that assertion is not supported by the record.  The Department correctly pointed out that it conducted a number of evaluations within the last three years, including a psychoeducational evaluation on February 10, 2022,[159] which assessed and measured many of the same indicators, deficits, and skill levels as would a neuropsychological evaluation.  Moreover, the Parent offered no evidence to show that she communicated her disagreement with any of the Department's evaluations.  In fact, she asserted there were none, which is not the case.  On this record, I cannot find that the Student is owed a neuropsychological evaluation at public expense, and the request is denied.


## **DECISION AND ORDER**

Upon the foregoing, it is hereby,

**Ordered**, that the DOE shall fund the unpaid portion of the cost of the aggregate tuition obligation for the Student's placement at the Private School for the 12-month extended 2022-2023 school year, in the amount of $100.00 to the Parent, and $278,152.80 paid directly to the Private School; and it is further

**Ordered**, that the DOE shall make available and pay for the cost of round-trip door-to-door special education transportation services to enable the Student's attendance at the Private School for the 12-month extended 2022-2023 school year, via lift-bus ambulance, with a 1:1 nurse

---

[156] 34 CFR 300.502(a)(3)(i).

[157] 8 N.Y.C.R.R. § 200.5(g).

[158] Ex. A-6.

[159] *See* Ex. 7.

present during transportation, and oxygen or a ventilator (or both), air conditioning, and with as reasonably limited time travel as possible, the cost of which shall be paid in accordance with the terms of the contract entered into evidence,[160] provided that the rate shall not exceed $345.00 per trip; and it is further

**Ordered**, that for any Private School services provided by a 1:1 nurse or a 1:1 paraprofessional, and any transportation services provided by a 1:1 nurse, as ordered above for the 12-month 2022-2023 school year, where such services are not paid under the Private School enrollment contract or the transportation contract, respectively, the DOE shall fund those services directly to such providers, paid at the higher of either current market rate or the highest rate the Department has paid during the six months preceding this decision.

**So Ordered.**

Richard J. Zeitler, Jr. (signed electronically)
Impartial Hearing Officer

Dated: September 20, 2022

---

[160] *See* Ex. F.

### *NOTICE OF RIGHT TO APPEAL*

*Within 40 days of the date of this decision, the parent and/or the Public School District has a right to appeal the decision to a State Review Officer (SRO) of the New York State Education Department under section 4404 of the Education Law and the Individuals with Disabilities Education Act.*

*If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.*

*An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at* http://www.sro.nysed.gov.

Findings of Fact and Decision                                                                 27
Case No. 228745

## **DISTRICT EVIDENCE**

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| 1 | Due Process Complaint 7/6/2022 8 | 7/6/2022 | 8 |
| 2 | Individualized Education Program | 4/6/2022 | 73 |
| 3 | Prior Written Notice | 6/24/2022 | 10 |
| 4 | Meeting Minutes | 4/6/2022 | 7 |
| 5 | IEP Meeting Attendance | 4/6/2022 | 1 |
| 6 | Mandated Three Year Reevaluation | 11/30/2021 | 11 |
| 7 | Psychoeducational Evaluation | 3/24/2022 | 8 |
| 8 | Behavior Assessment | 2/16/2022 | 23 |
| 9 | Classroom Observation | 3/7/2022 | 1 |
| 10 | Social History Update | 2/8/2022 | 3 |
| 11 | AT Evaluation | 3/10/2022 | 11 |
| 12 | AT Item List | 3/10/2022 | 2 |
| 13 | AT Evaluation Attendance | 3/10/2022 | 1 |
| 14 | AAC Trial Plan | 3/10/2022 | 2 |
| 15 | AT Training Log | 5/5/2022 | 4 |
| 16 | AT Training Attendance | 5/5/2022 | 1 |
| 17 | Physical Therapy Evaluation | 12/27/2021 | 6 |

## PARENT EVIDENCE

| Exhibit | Title | Date | Pages |
|---------|-------|------|-------|
| A | Due Process Complaint 228745 (2022-2023 school year) | 07/06/2022 | 8 |
| B | iBRAIN IEP | 04/05/2022 | 64 |
| C | NYC DOE IEP | 04/06/2022 | 74 |
| D | Prior Written Notice | 05/20/2022 | 10 |
| E | iBRAIN Enrollment Contract | 06/14/2022 | 7 |
| F | Transportation Agreement | 06/16/2022 | 5 |
| G | Ten Day Notice | 06/17/2022 | 2 |
| H | Determination Report | 07/12/2022 | 1 |
| I | Affidavit of Tiffany Semm | 08/30/2022 | 5 |
| J | Affidavit of Maytinee Bird | 08/30/2022 | 3 |

## IHO EVIDENCE

| Exhibit | Title | Date | Pages |
|---------|-------|------|-------|
| I. | Pre-Hearing Conference Summary and Order | 08/30/2022 | 3 |

Findings of Fact and Decision                                                                           29
Case No. 228745

## **APPENDIX**

| **Redacted Information** | **Term Used In FOFD** |
| --- | --- |
| ███████████ | Student |
| Maytinee Bird | Parent |
| John Henry Olthoff | Parent Attorney |
| Erin Dunn | Department Attorney |
| P.S. 007 | DOE Placement School |
| International Academy for the Brain (iBrain) | Private School |
| Tiffany Semm | Private School Special Education Director |
| Q255 at P.S. Q007 | Public School |
| N/A | Committee on Special Education |
| N/A | School Psychologist |
| N/A | DOE Special Education Teacher |
| N/A | Principal |
| N/A | Case Manager |
| N/A | Occupational Therapist |
| N/A | Physical Therapist |
| N/A | Speech-Language Therapist |