NURSING SERVICE AGREEMENT

This agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between Marlene Frias, hereinafter referred to as "CLIENT", Parent of ▮▮▮▮▮▮▮▮ hereinafter referred to as "STUDENT" residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, hereinafter referred to as "HOME" and B&H Health Care Services, Inc. - DBA Park Avenue Home Care, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 175 South 9th Street, Brooklyn, NY 11211.

1. TERM

This annual AGREEMENT shall be effective from January 10, 2024, through June 21, 2024, hereinafter referred to as "TERM", and cannot be terminated except as provided in Section 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN"), located at 403 East 91 st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 218 days based on the SCHOOL 12-month 2023-2024 School Year calendar, hereinafter referred to as "SCHOOL DAYS." The hours of operation for the STUDENT at the SCHOOL are typically 8:30AM to 4:30PM, with slight variations depending on the unique needs of the STUDENT, hereinafter referred to as "SCHOOL HOURS."

2.   PURPOSE OF THIS AGREEMENT

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of 1:1 Private Duty Nursing services during the school day and/or a 1:1 Transportation Nurse, hereinafter referred to as "SERVICES", for STUDENT during the TERM during SCHOOL DAYS as outlined in section 3 below.

3.   SCHEDULE OF SERVICE

TRANSPORTATION NURSE SCHEDULE
PROVIDER shall provide a 1:1 Transportation Nurse for STUDENT
- The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."
- The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."
- The AM TRIP and PM TRIP will be no more than [90] minutes each way.

1

- There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."
- In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP." The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

**SCHOOL NURSE**
- PROVIDER shall provide a 1:1 Private Duty Nurse for STUDENT during the SCHOOL HOURS.

**INCLEMENT WEATHER**

PROVIDER will follow the decisions of the NYC DOE, for all Inclement Weather school delays or cancellations (see http://schools.nyc.gov/default.htm for weather information regarding cancellations/policies). SERVICES will be provided for delayed opening and early dismissals according to the NYC DOE's weather-related changes. Other adjustments to pick-up times may be made as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

4. **PROVIDER RESPONSIBILITES**

PROVIDER shall provide the SERVICES in accordance with the terms of this AGREEMENT.

The PROVIDER agrees to use properly trained and licensed nurses employed by or under contract with the PROVIDER.

PROVIDER is not responsible for providing additional medical or health equipment needed for STUDENT, such as, but not limited to, food, medicines, oxygen equipment, gastrostomy tube equipment, or tracheostomy tube equipment.

5. **INSURANCE**

PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT proper insurance coverages for the SERVICES performed, including, but not limited to:
- Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT; and
- General Liability Insurance for all SERVICES in connection with this AGREEMENT.

6. **FEES and PAYMENT FOR SERVICES**

The PARTIES agree all SERVICES will be billed at an annual rate of $140,910.00, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $0.00 due on July 5, 2023, Payment 2: $0.00 due on September 1, 2023, and a final payment, Payment 3: $140,910.00 due on January 1, 2024.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined in Section 7.

PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) through either a stipulation agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until a final administrative or judicial decision is made and then payment will become immediately due within thirty (30) days of the final adjudication or execution of a Stipulation Agreement.

In the event Parent is denied all or part of the funding due under this Agreement by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent will be permitted to immediately terminate this contract per Section 7 below. Upon termination, Parent will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent for any balances due to PROVIDER on the date of withdrawal.

7. **TERMINATION**

Termination for Cause. If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be affected by serving a notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring SERVICES.

3

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination

**8.  INDEPENDENT CONTRACTOR RELATIONSHIP**

The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

**9.  COMPLIANCE WITH LAWS**

PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

**10. NONDISCRIMINATION POLICY**

PROVIDER is an equal opportunity employer.

<u>Nondiscrimination in Employment</u>.   In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

<u>Nondiscrimination in Services</u>.  PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination.  PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

**11.  ASSIGNMENT/SUBCONTRACTING**

4

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and insure to the benefit of the successors and assigns of PROVIDER.

12.    CONSENT TO COLLATERAL ASSIGNMENT

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

13.    MODIFICATIONS

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

14.    NOTICE

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

15.    ATTORNEY'S FEES AND COSTS

5

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

**16.    JURISDICTION**

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction.  Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

**17.    SEVERABILITY**

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

**18.    ENTIRE CONTRACT**


The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded.  Further, any modification of this AGREEMENT shall be in writing and signed by both PARTIES.  Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination.  It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.


19. EXECUTION OF AGREEMENT The AGREEMENT may be executed in counterpart with facsimile copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

**STUDENT** ███████

**CLIENT:** Marlene Frias

*Marlene Frias*
_____
CLIENT SIGNATURE

**PROVIDER**:

_____
Account Manager/Authorized Signature

266 Broadway #302, Brooklyn, NY 11211



## Completed Document Audit Report
Completed with SignWell.com

### Title: AGREEMENT

Document ID: da6e2195-46bd-4c64-bae0-6db23bb8b275

Time Zone: (GMT+00:00) Coordinated Universal Time

### Files

| | |
|---|---:|
| AGREEMENT.pdf | Jan 08, 2024 19:10:09 UTC |

### Activity

| | | |
|---|---|---:|
| **Susan Friedman**<br>IP: 98.116.5.178 | created the document | Jan 08, 2024<br>19:10:35 UTC |
| **Susan Friedman** | sent the document to malersfrias@gmail.com and cjacobowitz@nursingpersonnel.com | Jan 08, 2024<br>19:11:33 UTC |
| **[Email ID]**<br>IP: 98.116.5.178 | cjacobowitz@nursingpersonnel.com - first viewed document | Jan 08, 2024<br>19:29:25 UTC |
| **[Email ID]**<br>IP: 98.116.5.178 | cjacobowitz@nursingpersonnel.com - signed the document | Jan 08, 2024<br>19:29:40 UTC |
| **Marlene Frias**<br>IP: 24.38.234.12 | first viewed document | Jan 08, 2024<br>23:06:58 UTC |
| **Marlene Frias**<br>IP: 24.38.234.12 | signed the document | Jan 09, 2024<br>19:24:00 UTC |